UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAURA L. MASELTER,                                    CIVIL NO. 07-2921 (RHK/JSM)

            Plaintiff,

                                                      **AMENDED**
v.                                                    REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.

JANIE S. MAYERON, United States Magistrate Judge

        The above matter is before the undersigned United States Magistrate Judge on

plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for

Summary Judgment [Docket No. 11].  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

        For the reasons discussed below, it is recommended that plaintiff's Motion for

Summary Judgment [Docket No. 9] be DENIED and defendant's Motion for Summary

Judgment [Docket No. 11] be GRANTED.

**I.      PROCEDURAL BACKGROUND**

        Plaintiff protectively applied for Disability Insurance Benefits under Title II of the

Social Security Act, 42 U.S.C. §§ 401 et seq. on August 20, 2004.  (Tr. 92).  Plaintiff

alleges a disability beginning May 28, 2004.  (Tr. 99).  The Social Security

Administration ("SSA") denied plaintiff's application initially and upon reconsideration.

(Tr. 55-62).  Plaintiff then filed a request for a hearing and on June 28, 2006, a hearing

was held before ALJ David K. Gatto.  (Tr. 32, 445-470).  On October 23, 2006, the ALJ issued a decision to deny plaintiff benefits.  (Tr. 14-29).  Plaintiff requested review from the Appeals Council.  (Tr. 27).  On March 23, 2007, the Appeals Council denied her request for review.  (Tr. 6-8).  Denial of review by the Appeals Council made the ALJ's decision the final decision of the Commissioner in this case.  (Tr. 6).  See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment [Docket No. 11].

Plaintiff had previously applied for a period of disability, disability insurance benefits, and supplemental security income on January 23, 2003.  (Tr. 17).  Those applications were denied initially on March 24, 2003, on reconsideration, and on May 27, 2004, after a hearing before an Administrative Law Judge.  (Tr. 38-53).  Prior to that, plaintiff had applied for a period of disability, disability insurance benefits, and supplemental security income on January 11, 1996 and for supplemental security income on August 4, 1992.  (Tr. 17).  Those applications were denied initially on June 5, 1996 and on September 17, 1992, respectively.  (Tr. 17).

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security

Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least 12 months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is

disabled.  The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work.  If the claimant can perform past relevant work, [he] is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent [him] from doing other work.  If so, the claimant is disabled.

Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994).

**B.      Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.      Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of plaintiff's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).   "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.   Culbertson, 30 F.3d at 939.   The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would

support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

Plaintiff, born June 21, 1958, was 48 years old on the date of the ALJ's decision. (Tr. 99). Plaintiff has past relevant work experience as a cook and a factory clerk. (Tr. 274). Plaintiff has alleged disability due to fibromyalgia, head injury, stiffness throughout body, migraine headaches, hands falling asleep, and lower back numbness. (Tr. 115-116).

The ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 29). The ALJ stated that he made the following findings based on the entire record:

1.   The claimant last met the insured status requirements of the Social Security Act on June 30, 2006.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 28, 2004 through her date last insured of June 30, 2006 (20 CFR 404.1520(b) and 404.1571 et seq.).

3.      Through the date last insured, the claimant had the following severe impairments: fibromyalgia or chronic pain syndrome, degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome status-post release surgeries, a history of left foot Achilles laceration and repair and recent cellulitis,[1] left shoulder degenerative joint disease, alcoholism and depression.  (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of light work, defined as lifting 20 pounds occasionally and 10 pounds frequently with sitting, standing, and walking each up to six hours of an eight hour day, but with a brief, one to two minute, sit or stand option every 30 minutes, that never involve climbing of ladders, ropes or scaffolds or crouching or crawling, with only occasional balancing, bending or twisting, which avoids all exposures to heights and dangerous moving machinery due to medication side effects, that requires only occasional firm gripping or grasping, or overhead reaching and that consists of unskilled work tasks, with brief and superficial contacts with the public, coworkers and supervisors and are performed in an alcohol free workplace.  (20 CFR 404.1545).

6.      In determining the above residual functional capacity, the undersigned has considered the claimant's subjective allegations, but finds that her testimony of an inability to work was not credible due to substantial inconsistencies in the record as a whole.  (20 CFR 404.1529(c), SSR 96-7p; Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

7.      Through the date last insured, the claimant was unable to perform past relevant work.  (20 CFR 404.1565).

8.      The claimant was born on June 21, 1958, and was 48 years old on the date last insured, which is defined as a younger individual age 45-49 (20 CFR 404.1563).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

---

[1]      Cellulitis is a bacterial infection of the deepest layer of your skin.   See http://www.nlm.nih.gov/medlineplus/cellulitis.html.

10.     Transferability of job skills is not material to the determination of disability as she is limited to unskilled work.

11.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time from May 28, 2004, the alleged onset date, through June 30, 2006, the date last insured (20 CFR 404.1520(g)).

(Tr. 19-29).

**B.     The ALJ's Application of the Five-Step Process**

In reaching his findings, the ALJ made the following determinations under the five-step procedure.  (Tr. 19-29).  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Tr. 19).

At the second step, the ALJ found that plaintiff was subject to severe impairments of fibromyalgia or chronic pain syndrome, degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome status-post release surgeries, a history of left foot Achilles laceration and repair and recent cellulitis, left shoulder degenerative joint disease, alcoholism and depression.  (Tr. 20).

At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (Tr. 20).  At the fourth step, the ALJ found that plaintiff could not perform her past relevant work.  (Tr. 27).  At the fifth step, the ALJ determined that there were jobs that existed in significant numbers in the national economy that plaintiff could have performed and therefore found plaintiff to be "not disabled."  (Tr. 39).

## IV.    ISSUES UNDER REVIEW

On appeal, plaintiff first contends that the ALJ failed to accord adequate weight to the opinion of the treating physicians.  Pl. Mem., p. 3.  [Docket No. 10].  In this regard, plaintiff claims the ALJ dismissed and gave no weight to the opinion of Dr. Richard Linares made in July of 2005.  Second, plaintiff argues that the ALJ erred in finding plaintiff's subjective complaints to be not credible.  Pl. Mem., p. 3.  Specifically, plaintiff claims that the ALJ failed to adequately address the factors found in SSR 96-7p. Finally, plaintiff claims that the ALJ failed to comply with the Commissioner's policies in evaluating the severity of her fibromyalgia.  Pl. Mem., p. 5.

## V.    THE RECORD

### A.    <u>Medical Records</u>

At issue in this case is the time period from plaintiff's alleged onset date of disability, May 28, 2004, through the date of last insured, June 30, 2006.  As such, the Court confines its review here to the relevant records from that period of time.[2]

On June 27, 2004, plaintiff was seen by Dr. John Mertz at St. Cloud Hospital after her husband found her passed out on the front lawn; she was diagnosed with alcohol intoxication.  (Tr. 310-311).  Dr. Mertz noted that plaintiff told him that she had fractured both of her legs when they were obviously not fractured.  (Tr. 311).  Plaintiff's physical examination was normal, though plaintiff had multiple bruises of differing ages. (Tr. 311).  Plaintiff reported that she was not suicidal and not depressed.  (Tr. 310).

---

[2]     Plaintiff also submitted additional medical records to the Appeals Council at the time she filed her Request for Review.  Those records will be discussed in connection with Section V.D, <u>infra</u>.

Plaintiff was seen by Dr. Richard Linares at the St. Cloud VA on June 29, 2004. (Tr. 429-431).  Plaintiff had an initial physical examination, which noted a history of fibromyalgia.  (Tr. 429).  Plaintiff was noted to be taking Tramadol[3] and ibuprofen and Flexeril.[4]  (Tr. 429).  Plaintiff had a history of chronic neck pain for which she used a TENS unit.[5]  (Tr. 429).  Plaintiff also had a history of an Achilles tendon laceration done by farm machinery, which was repaired, and plaintiff had chronic pain, edema and some numbness of her left foot.  (Tr. 429).  Plaintiff had a history of anemia and irritable bowel syndrome.  (Tr. 429-430).  Plaintiff had previous surgery for bilateral carpal tunnel, gallbladder removal and appendectomy.  (Tr. 430).  Plaintiff stated that she was on disability because of fibromyalgia, that she performed activities of daily living and independent activities of daily living.  (Tr. 430).  Plaintiff reported pain in multiple joints including her neck, lower back and wrists, right shoulder, and numbness in both hands bilaterally related to carpal tunnel syndrome.  (Tr. 430).  Her pain scale was 7.  (Tr. 431).  Dr. Linares continued plaintiff on Tramadol and Flexeril, and asked her to reduce her ibuprofen intake.  (Tr. 432).  He referred plaintiff to physical therapy to obtain another TENS unit and to obtain wrist braces for her carpal tunnel syndrome.  (Tr. 432).

Julie Schoenecker, LPN at the St. Cloud VA entered a note regarding plaintiff's visit on June 29, 2004.  (Tr. 432).  Plaintiff reported lower back pain, which was being controlled with ibuprofen and Flexeril.  (Tr. 433).  Her pain was rated as a 7.  (Tr. 433).

---

[3]     Tramadol is used to relieve moderate to moderately severe pain.  <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

[4]     Flexeril is a brand name for cyclobenzaprine, a muscle relaxant.  <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

[5]     A TENS (transcutaneous electriclal nerve stimulation) unit is A TENS machine is a small device that sends electrical impulses to certain parts of the body to block pain signals. <u>See</u> http://vsearch.nlm.nih.gov.

Plaintiff reported that her pain medications for fibromyalgia did not seem to be helping, that she could not walk at times, and had severe pain at times and tingling in her legs. (Tr. 434).  Plaintiff was put on Tramadol, ibuprofen and Cyclobenzaprine.[6]  (Tr. 434).

On July 15 and 16, 2004, plaintiff was seen at St. Cloud Hospital.  (Tr. 300-307). On July 15, plaintiff arrived intoxicated after her husband took her to the Detoxification Center at the St. Cloud VA Hospital.  (Tr. 306).  Dr. Peter Charvat diagnosed plaintiff with alcohol intoxication and noted a history of herniated disk, fibromyalgia, lumbar disk disease, foot surgery and degenerative joint disease of the back.  (Tr. 306).  On July 16, she complained of pain to her tailbone area because she had fallen off of her bike twice a couple of weeks prior.   (Tr. 300).   Patricia Ellis, PA-C, performed a physical examination which showed that her head was normocephalic,[7] nontender and atraumatic; her neck was supple; there was some mild diffuse cervical spine tenderness in her cervical spine and she had full range of motion to the cervical spine with mild tenderness.  (Tr. 301).  There was no trauma or deformity of the lumbar spine, but there was some diffuse midline lumbar spine tenderness to palpation.  (Tr. 301).   Ellis obtained lumbar spine x-rays and a CT scan.  They showed that there was no fracture, but there was some broad-based degenerative joint disease with some mild disk protrusion, and a questionable far lateral disk bulge with no impingement.  (Tr. 301, 303, 305).  Plaintiff was instructed to apply ice or heat to the painful area and returned to Detox.  (Tr. 301).

---

[6]     Cyclobenzaprine is a muscle relaxant.  See http://www.nlm.nih.gov/medlineplus/druginfo.

[7]     Normocephalic: essentially a normal head; having a head of medium length; denoting a skull with a cephalic index between 75 and 80 and with a capacity of 1350 to 1450 ml, or an individual with such a skull.  See www.stedmans.com.

Plaintiff was seen by Dr. Stephen Swenson at St. Cloud Hospital on July 30, 2004, presenting with altered level of consciousness. (Tr. 314). Plaintiff's admission notes state that she was obviously delusional and could not provide any reliable history. (Tr. 317). Dr. Swenson noted that plaintiff's general medical health was significant for chronic pain issues, and that she presented with fibromyalgia and lumbar disk disease. Dr. Swenson diagnosed plaintiff with substance-induced psychotic disorder, alcohol withdrawal, adnexal mass, chronic pain, fibromyalgia, lumbar disk disease, arthritis and status post cholecystectomy.[8] (Tr. 315). She was seen by a psychiatrist, Dr. Dean Watkins, on July 31, 2004; plaintiff was confused and could not remember the events of the previous day. (Tr. 323). Plaintiff denied a history of depression, anxiety or psychotic disorders and denied a history of prescription psychiatric medication use. (Tr. 323). Dr. Watkins observed that plaintiff was an unreliable historian. (Tr. 323). Plaintiff did not initially know the month, date or year. (Tr. 324). Plaintiff arranged chemical dependency treatment through the VA and was discharged on August 4, 2004. (Tr. 314).

Dr. Watkins assessed plaintiff as follows:

Axis I:      Alcohol dependence and very probable recent intoxication and suspected withdrawal

Axis II:     Deferred

Axis III:    See past medical history

Axis IV:    Moderate stresses

---

[8]   Cholecystectomy: gallbladder removal. See http://www.nlm.nih.gov/medlineplus/ency/

12

Axis V:        GAF currently 20-30, past year unknown[9]

(Tr. 325).

Plaintiff also underwent a head CT scan on July 30, 2004, which found no evidence for acute infarct, hemorrhage, mass or mass effect.  (Tr. 343).  Plaintiff was found to have mild atrophy given plaintiff's stated age.  (Tr. 343).

On August 2, 2004, Dr. Swenson examined plaintiff again.   (Tr. 326-329). Plaintiff identified her drug of choice as alcohol and admitted to using between 2 and 12 units of alcohol per day.   (Tr. 326).   She admitted to tremulousness in alcohol withdrawal.  (Tr. 326).  Plaintiff denied depressed feelings.  (Tr. 328).  Her head was noted as normocephalic, and her neck was supple.   (Tr. 328).   Dr. Swenson's impression was that plaintiff had delusional disorder, resolving; alcohol withdrawal; chronic pain syndrome; fibromyalgia; status post cholecystectomy; arthritis; lumbar disc disease; and mild anemia; Dr. Swenson ruled out psychotic disorder, not otherwise specified.  (Tr. 328).  Plaintiff was transferred to the Adult Mental Health Unit for further stabilization, restarted on Flexeril and opiates for chronic pain, and her TENS unit was ordered.  (Tr. 328).

Dr. Swenson dictated a progress note on August 3, 2004, noting that plaintiff's gait and station were intact, with no pain behaviors, no signs of opiate withdrawal, and

---

[9]        The GAF scale is used to assess an individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  A GAF score of 20-30 indicates an individual's behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

that plaintiff was oriented as to person, place and time.  (Tr. 330).  On August 4, 2004, Cynthia Sandberg, RN, CNP examined plaintiff pursuant to Dr. Swenson's request.  (Tr. 332-334).  Plaintiff had complained of pelvic pain and reported that she was exposed to gonorrhea in January of 2004.  (Tr. 332).  Sandberg reported an adnexal mass palpated on plaintiff's left side, and plaintiff was instructed to follow-up with Dr. Lenarz (Linares) at the VA.  (Tr. 333).

On September 30, 2004, plaintiff was seen by Dr. Lucinda Marty at the St. Cloud VA for a rheumatology consult.  (Tr. 422-426).  Dr. Marty noted that plaintiff had whole body pain.  (Tr. 422).  Plaintiff showed diminished range of motion in all directions with slow motion, tender points at the base of the skull and in the first rib area, along her costal cartilages bilaterally in her anterior chest wall, and biceps and supraspinatus areas.  (Tr. 424).  Plaintiff's right shoulder had full passive range of motion, and the left shoulder had diminished external rotation.  (Tr. 424).  Plaintiff was tender in the medial upper arms, in both lateral epicondyles[10] and the wrists and hands.  (Tr. 424-425).  She was assessed as having fibromyalgia.  (Tr. 425).  Dr. Marty increased Gabapentin[11] for the fibromyalgia along with the Cyclobenzaprine and referred plaintiff to physical therapy.  (Tr. 425).

On October 4, 2004, plaintiff's lumbar spine films from September 15, 2004 were compared with prior films from July 16, 2004.  (Tr. 468).  An MRI was recommended for further evaluation.  (Tr. 468).

---

[10]     An epicondyle is defined as a projection from a long bone near the articular extremity above or upon the condyle, which is defined as a rounded articular surface at the extremity of a bone.  Stedman's Medical Dictionary, 27th Ed. (2000).

[11]     Gabapentin is an anti-convulsant.  See http://www.nlm.nih.gov/medlineplus/druginfo/

Plaintiff saw Dr. Linares on November 2, 2004, for a follow-up on her pain.  (Tr. 421).  At the time, plaintiff used ibuprofen and Neurontin.[12]  (Tr. 421).  Dr. Linares noted that plaintiff had MRIs done which showed degenerative disk disease in her neck.  Dr. Linares had requested an MRI of plaintiff's neck in early September, but plaintiff canceled that appointment.  (Tr. 421).  Plaintiff reported her pain as a 7 in her low back, neck and shoulder, however, she did not appear to be in any acute distress.  (Tr. 421).  Plaintiff had full range of motion in her neck, mild tenderness over the cervical spine, but no significant muscle spasms, and decreased range of motion in her left shoulder because of pain, along with tenderness.  (Tr. 422).  No significant spasm was noted on examination of the back.  (Tr. 422).  Plaintiff was assessed as having chronic neck pain, present for over 10 years, left shoulder pain, with possible rotator cuff tendonitis of the shoulders, and chronic low pack pain.  (Tr. 422).  Dr. Linares increased plaintiff's Gabapentin and asked plaintiff to start taking Flexeril; plaintiff could continue with ibuprofen and tramadol as needed.  (Tr. 422).

On November 4, 2004, a functional capacity assessment was performed by state agency physician Dr. Thomas Chisholm.  (Tr. 372-379).  Dr. Chisholm determined that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and walk for a total of six hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and that she was limited in her upper extremities for pushing and pulling.  (Tr. 373).  Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and occasionally climb ladders, ropes and scaffolds.  (Tr. 374).  Plaintiff was determined to be limited in gross manipulation and handling, had no visual limitations or

---

[12]    Neurontin is a brand name for gabapentin.  See http://www.nlm.nih.gov/medlineplus/druginfo/

communicative limitations, and was to avoid even moderate exposure to hazards such as machinery and heights.  (Tr. 375-376).  Plaintiff's symptoms were attributable to a medically determinable impairment.  (Tr. 377).

On November 10, 2004, plaintiff was evaluated for lower back pain and an MRI of the lumbar spine was performed.   (Tr. 462-463).   The MRI found no areas of abnormal enhancement to suggest an abscess or diskitis, some degenerative changes at L3-4 and L4-5.  (Tr. 463).

On December 7, 2004, plaintiff saw Dr. Linares for a follow-up.  (Tr. 419).  Dr. Linares noted that plaintiff's chronic neck pain appeared to be getting worse over time; plaintiff also reported some numbness of her hand and parasthesias[13] of both hands and weakness grabbing and lifting objects.  (Tr. 419).  Plaintiff's pain scale was 6, but he observed that she seemed very casual, smiled, was very mobile and did not appear to be in any significant distress.  (Tr. 419).  Dr. Linares indicated she had full neck rotation with some tenderness to palpation over the cervical spine.   (Tr. 419-420). Motor examination in both upper extremities revealed 5/5 strength and grip in both hands and elbows, and 5/5 strength, flexion and extension in her lower extremities.  (Tr. 420).  Dr. Linares assessed plaintiff as having chronic neck pain with radiation to both arms, paresthesias in both arms, worsened radiation to the left shoulder and chronic back pain.  (Tr. 420).

On December 27, 2004, plaintiff had a cervical spine MRI, which showed disk space narrowing with degenerative arthritis.  (Tr. 467).  It was noted that there was no definite change from prior films taken July 23, 2003.  (Tr. 467).

---

[13]     Paresthesia: An abnormal sensation, such as of burning, pricking, tickling, or tingling. See www.stedmans.com.

On January 7, 2005, plaintiff saw Dr. Linares for a follow-up.  (Tr. 418).  Plaintiff stated she had pain daily and would like to have better control of her pain so that she can do more during the day and be more active.  (Tr. 418).  Dr. Linares spoke to plaintiff about the need to keep her appointments with neurosurgery and the MRI scan appointment.  (Tr. 418).

On January 10, 2005, plaintiff was seen by Dr. Michael Hebert for an orthopedics consult.  (Tr. 416, 451).   Dr. Hebert noted that plaintiff's MRI showed multiple disk protrusions with degeneration of the disk spaces at multiple levels.  (Tr. 417).   Her shoulder x-ray showed no obvious severe arthrosis.  (Tr. 417, 461).   The MRI of her lumbosacral spine showed mild degenerative changes but no severe spondylolisthesis.[14]  (Tr. 417, 461).  Plaintiff could not give a full history and Dr. Hebert could not discuss treatment recommendations with her because plaintiff had to leave to catch her bus.  (Tr. 417).  The MRI found normal alignment of the lumbar spine, anterior spurring at multiple levels, degenerative facet disease at L5-L6, and the impression was multilevel degenerative disc disease of the cervical spine without significant stenosis.[15] (Tr. 462).

On January 12, 2005, plaintiff called to state that she did not want to be seen at the neurosurgery clinic at that time.  (Tr. 448).

---

[14]    Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it.  See http://www.nlm.nih.gov/medlineplus/ency/

[15]    Stenosis: A stricture of any canal or orifice.  See www.stedmans.com.

Plaintiff saw Dr. Linares on March 18, 2005 for a follow-up.[16] (Tr. 526). Dr. Linares noted that plaintiff was seen by orthopedics in January of 2005 but did not stay to discuss with them recommendations for treatment. (Tr. 526).

On June 15, 2005, plaintiff was seen for an orthopedics consult by Dr. James Johanson. (Tr. 413, 443). Plaintiff's chief complaint was lumbosacral pain beginning in 2001 when she fell on ice. (Tr. 414). Plaintiff had been diagnosed with fibromyalgia. (Tr. 414). Plaintiff described herself as very stiff in the morning, and described pain in her low back and almost every joint. (Tr. 414). Plaintiff also stated that she was under stress. (Tr. 415). Plaintiff reported that she had a head injury in 2002. (Tr. 415). Examination showed that she was slow with flexion and extension, but it was full and she had full rotation. (Tr. 415). Plaintiff complained of pain with straight leg raising and use of the percussion hammer. (Tr. 415). Plaintiff had tenderness all over her spine, described as consistent and significant pains. (Tr. 415). Muscle testing showed 5/5 strength in all extremities. (Tr. 416). An epidural block was ordered. (Tr. 416).

Review of an MRI showed spinal stenosis in the lower lumbar region. (Tr. 415, 460). The MRI also showed scoliosis of the lumbar spine, significant disc space narrowing with associated subchondral sclerosis at the L4-L5 level and similar findings to a lesser degree at the L3-L4 and L5-L6 levels, anterior spurring, and degenerative changes involving the facet joints of the lower lumbar spine. (Tr. 460). It was noted that overall, the findings were similar in appearance to the films of the lumbar spine dated January 10, 2005. (Tr. 460).

---

[16]     The medical record from this date appears to be incomplete.

Plaintiff saw Dr. Linares on July 20, 2005; plaintiff had been scheduled for an epidural block on June 22, but the clinic cancelled it and plaintiff never heard back but she was willing to undergo the epidural block.  (Tr. 408-409).  Plaintiff's pain scale was 4/10.  (Tr. 409).  Dr. Linares increased her Nortriptyline[17] and methadone.  (Tr. 409). On the same day, Dr. Linares wrote a letter "To Whom This May Concern" "at the request of and to be used by [plaintiff]," stating that she had chronic fibromyalgia, chronic degenerative joint disease of the cervical spine, and chronic low back pain with associated significant spinal stenosis with radiating pain to her lower extremities.  (Tr. 411).  Dr. Linares recommended restrictions of no prolonged standing from 1-15 minutes, no lifting over 5 pounds, no bending, twisting or stooping, no reaching above shoulder level, no sitting for longer than 10 minutes and no walking for over 20 minutes. (Tr. 411).

Plaintiff visited Dr. Linares on August 16, 2005 to request another referral to orthopedics; plaintiff had been seen by orthopedics earlier and they had scheduled an epidural injection for August 1; however, plaintiff could not make the appointment because of the bus schedule.  (Tr. 406).  Plaintiff's pain was 8-9.  (Tr. 406).  Dr. Linares arranged for plaintiff to be rescheduled for the procedure at a time that allowed her to catch the bus.  (Tr. 406).

On August 26, 2005, plaintiff saw Dr. Phuc Nguyen at the VA.  (Tr. 405).  Dr. Nguyen had previously referred plaintiff to occupational therapy, but after one session it did not help and she could not stay still.  (Tr. 405).  Plaintiff was ambulatory in discomfort and stated that she still had pain all over her body.  (Tr. 405).

---

[17]    Nortriptyline is used to treat depression.  <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

Plaintiff saw Dr. Linares on September 30, 2005 for headache evaluation.  (Tr. 402).  Plaintiff reported that it was mostly upper neck pain radiated to the left occipital and parietal area and the area around the ear, and that she usually had it at night.  (Tr. 402).  Tramadol provided partial relief of the pain.  (Tr. 403).  Plaintiff reported that her pain was 8/10 the day of examination although she did not appear to be in any significant distress and was otherwise fairly mobile and not walking around with difficulty.  (Tr. 403).  Dr. Linares noted that she was carrying her purse and a bag into the office and that she was able to bend over and pick up the bag without any visible difficulty.  (Tr. 403).  Examination showed fairly good range of motion.  (Tr. 403).  Dr. Linares referred plaintiff to physical therapy for treatment of her neck pain.  (Tr. 404).

On October 11, 2005, plaintiff called to notify the clinic that she would not be having the epidural done.  (Tr. 413).

On October 13, 2005, plaintiff saw Dr. Linares for an infected cyst on the posterior aspect of the left lower extremity.  (Tr. 399).  She was assessed as having cellulitis of the left lower extremity, to be treated with Cephalexin.[18]  (Tr. 399).  Plaintiff was seen for a follow-up on October 20, 2005.  (Tr. 398).  Dr. Linares noted that the Achilles tendon had full function with no tenderness, and that there was a possible subcutaneous abscess; he continued the Cephalexin and requested an appointment with surgery to consider incision of the abscess.  (Tr. 398).

On October 31, 2005, plaintiff was seen by Norbert Jost, RN in triage because of a wound in her left leg with a piece of string hanging out of it.  (Tr. 396).  Plaintiff was ambulating without impairment and Jost instructed her not to pull the string and to return

---

[18]     Cephalexin is a cephalosporin antibiotic used to treat certain infections caused by bacteria.  See www.nlm.nih.gov/medlineplus/druginfo.

the next morning to have it examined.  (Tr. 396).  The next day, Dr. Frerichs removed the string.  (Tr. 394).

On January 6, 2006, plaintiff was seen for her annual Pap and pelvic exam by Dr. Stacy Holberg.  (Tr. 389).  Plaintiff reported that she exercised daily with a walking program and she rode the bus regularly.  (Tr. 390).  Dr. Holberg recommended regular exercise.  (Tr. 391).

On January 12, 2006, plaintiff saw Dr. Linares for a follow-up.  (Tr. 388).  Plaintiff had an MRI done for her lower back, which showed severe spinal stenosis at L3-L4 and moderately severe spinal stenosis in Lr-L5 region.  (Tr. 388).  Plaintiff was referred to Minneapolis Ortho, which recommended an epidural injection, but plaintiff declined.  (Tr. 388).  Dr. Linareas suggested she consider the epidural injection and increased her methadone.  (Tr. 388).

Plaintiff saw Dr. Linares for follow-up on March 14, 2006.  (Tr. 382).  Plaintiff complained of worsening back pain, with more stiffness and difficulty walking.  (Tr. 383).  Plaintiff was willing to consider evaluation by orthopedics and further intervention, including possible epidural injection.  (Tr. 383).  Plaintiff's pain scale was a 9 as related to her left shoulder, neck and lower back pain.  (Tr. 383).  Dr. Linares noted that plaintiff walked erect without any difficulty, and that she got up and walked around the office while talking to him because sitting down for long periods worsened her back pain.  (Tr. 383).  Dr. Linares referred plaintiff to physical therapy for her neck pain and explained that there was nothing he could do surgically on her neck.  (Tr. 383).  As for her lower back pain, Dr. Linares believed that plaintiff would benefit from an epidural injection, and plaintiff agreed.  (Tr. 381).  Dr. Linares increased plaintiff's methadone and Gabapentin,

and referred plaintiff to Dr. Nguyen to consider a cortisone injection for her left shoulder. (Tr. 384).

On March 29, 2006, plaintiff saw Dr. Nguyen.  (Tr. 382).  Plaintiff reported a fall in December and cracked her shoulder.  (Tr. 382).  Plaintiff had full range of motion and good strength in her left shoulder upon examination.  (Tr. 382).  Dr. Nguyen ordered x-rays for the recent fall; plaintiff was not a candidate for a local injection.  (Tr. 382).  The x-rays showed no acute fracture or dislocation, moderate degeneration in the AC joint, and mild degeneration in the glenohumeral joint.[19]  (Tr. 457).

On April 6, 2006, plaintiff met with Aaron Sufka, a physical therapist, for an initial consult.  (Tr. 479).  Sufka noted that plaintiff was functional but reported poor tolerance to her normal activity level historically; she could sit only about 20 minutes, and walked to therapy from the canteen (about 300 yards) with that being a good limit for her.  (Tr. 480).  He noted that plaintiff needed to stand often and that she repositioned while sitting; plaintiff had good flexion and rotation of the lower trunk without pain interference; and some weakness through the hip flexors and ankles.  (Tr. 480).  Sufka gave her a short program including stretching and strongly encouraged plaintiff to begin usage of the therapy pool.  (Tr. 480).

On May 22, 2006, plaintiff had another MRI of her lumbosacral spine.  (Tr. 481, 484).  Findings noted that there may be facet arthropathy at the lumbosacral level, which had not changed, and that the facets were unremarkable.  (Tr. 481).  There were stable degenerative disc changes.  (Tr. 481).

---

[19]     The glenohumeral joint, commonly called the shoulder joint, is a ball-and-socket-type joint that helps move the shoulder forward and backward and allows the arm to rotate in a circular fashion or hinge out and up away from the body.  See http://www.niams.nih.gov/Health_Info/Shoulder_Problems/default.asp.

On May 25, 2006, plaintiff called the clinic at the St. Cloud VA complaining of recurrent headaches despite medication. (Tr. 474-475). Plaintiff asked for an appointment the following day because she had multiple activities to participate in that day. (Tr. 475).

**B.** **Mental Health Records**

On December 7, 2004, plaintiff was evaluated by Dr. Phil Godding at the request of the Department of Economic Security. (Tr. 347-351). Dr. Godding noted that plaintiff did not evidence thought disorder or delusional thinking; plaintiff's mood was depressed, and her affect was frustrated, flat and irritable. (Tr. 347). Dr. Godding administered the Beck Depression Inventory – Second Edition (BDI-II), which placed her in the moderately depressed range of depressed mood symptoms. (Tr. 347-348). Dr. Godding noted that the BDI-II score was inconsistent with behavioral observations and interview data, and that plaintiff presented as suffering from many more depressive symptoms than indicated by her self-reporting measure on the test. (Tr. 348). Dr. Godding also administered the Folstein Mini Mental Status Examination (MMSE), which indicated grossly abnormal mental status and which Dr. Godding found to be consistent with behavioral observations and interview data. (Tr. 348). Dr. Godding noted that plaintiff's concentration and attention span were somewhat impaired by pain, chronic loss of sleep and depressed mood. (Tr. 348).

When asked to rate her pain on a scale of 0-10 on the day of the evaluation, plaintiff stated that her low back pain was an 8, that her left shoulder and neck pain was a 9 (and a 5 on the best day), her fibromyalgia was a 7 (and a 4 on the best day), her

left foot was a 4, and her headache was a 9 (and a 2 on the best day).  (Tr. 349).  On the worst day, her pain was a 10 for all of her ailments.  (Tr. 349).

Plaintiff reported that she woke up at 3 a.m., made coffee and read her Bible. (Tr. 350).  Her husband did the house work, but she considered cooking, playing cards and family time to be her primary hobbies.  (Tr. 350).  She performed her activities of daily living independently and thought she could live independently with a lot of help. (Tr. 350).

Dr. Godding observed that overall, the impact of plaintiff's physical problems was similar to that commonly found in pain disorders; he noted that discomfort and joint pain were the predominant focus of the clinical presentation and was of sufficient severity to warrant clinical attention; that psychological factors were judged to have an important role in the onset, severity, exacerbation or maintenance of the physical symptoms; that plaintiff's symptom or deficit was not intentionally produced or feigned; and that her pain was not better accounted for by mood, anxiety or psychotic disorder.  (Tr. 350).

Dr. Gooding assigned the following DSM-IV diagnosis:

| | |
|---|---|
| Axis I: | Pain disorder associated with both psychological factors and a general medical condition; major depressive disorder, recurrent |
| Axis II: | none |
| Axis III: | numerous health and pain problems |
| Axis IV: | financial stressors, inability to work |
| Axis V: | GAF (55) moderate symptoms[20] |

---

[20]    GAF scores of 51 to 60 reflect "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

(Tr. 351).

Dr. Godding opined that plaintiff was unable to handle funds due to cognitive impairment most likely due to distraction and lack of sleep due to pain, which reduced her motivation and capacity to handle her own funds.  (Tr. 351).  With respect to her ability to concentrate on and understand instructions, he stated there was ample evidence that plaintiff had the ability to comprehend instructions, and her ability to carry out physical tasks was limited by fatigue and pain to just a few minutes at a time.  (Tr. 351).  As to her ability to respond appropriately to co-workers and supervisors, he found that plaintiff had no recent opportunity to attempt work due to her health problems, but that she got along well with others and reported that she liked her jobs.  (Tr. 351). Regarding her ability to tolerate stress in the work place, he indicated that she had limited ability to tolerate stress due to the fact that her pain distracted her.  (Tr. 351). Dr. Godding recommended that plaintiff get a therapist or counselor to learn new coping mechanisms besides alcohol, that she could benefit from completing a chronic pain management clinic, and that she would need continued, aggressive treatment of her depressed mood.  (Tr. 351).

On January 8, 2005, Dr. Dan Larson reviewed plaintiff's medical records and performed a Mental Residual Functional Capacity Assessment at the request of the Social Security Administration.  (Tr. 352-371).  Dr. Larson determined that the medically determinable impairment of depression was present.  (Tr. 355).  He also noted behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  (Tr. 360).  Dr. Larson rated plaintiff's function limitations as follows:  plaintiff had a mild degree of functional limitation in her activities

of daily living and maintaining social functioning; a moderate degree of limitation in difficulties in maintaining concentration, persistence or pace; and no limitation in episodes of decompensation.  (Tr. 362).

Regarding her mental residual functional capacity, Dr. Larson found that plaintiff was able to live with her husband and reported that she did some cooking, cleaning and shopping within physical limits, read, played cards, socializes some, could usually get along with authority; although her concentration was down some, the overall picture supported sufficiency for basic chores.  (Tr. 370).  Dr. Larson determined that plaintiff retained the capacity to concentrate on, understand, and remember routine, repetitive tasks and uncomplicated instructions, but would have moderate problems with detailed instructions and marked problems with complex instructions; plaintiff's ability to carry out tasks with adequate persistence and pace would be mildly impaired but adequate for routine, repetitive or detailed tasks but not for complex tasks; her ability to interact and get along with co-workers would be mildly impaired but adequate for most social contact, and her ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact; her ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings; her ability to accept supervision would be moderately impaired, but adequate to cope with ordinary levels of supervision; and her ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.  (Tr. 370).

On August 2, 2005, plaintiff was seen by Dr. Elizabeth Fernandez, a psychiatrist. (Tr. 407).  Plaintiff's main complaints were multiple medical problems of pain and

fibromyalgia and that Social Security did not want to approve her application.  (Tr. 407).

She was anxious and depressed about this.  (Tr. 407).  Plaintiff was diagnosed with

adjustment disorder with depression secondary to medical problems.  (Tr. 408).  Dr.

Fernandez discontinued the Nortriptyline since plaintiff had not been taking it and

placed plaintiff on Buspirone[21] for anxiety.  (Tr. 408).

Plaintiff saw Dr. Fernandez on October 12, 2005.  (Tr. 400).  Plaintiff was seeking

medication other than Buspar,[22] which sedated her too much and she wanted

something that would not do that because she planned to go back to school.  (Tr. 400).

Dr. Fernandez discussed discontinuing the Buspar and changing her medication to

Citalopram.[23]  (Tr. 400).

On December 30, 2005, plaintiff saw Dr. Fernandez.  (Tr. 392).  Plaintiff reported

that she had been more anxious, and kept herself busy by walking and doing household

chores.  (Tr. 392).  Dr. Fernandez increased her Citalopram.  (Tr. 392).

Plaintiff saw Dr. Fernandez on May 9, 2006.  (Tr. 475).  She asked Dr.

Fernandez if she should be on Ritalin because she thought she had difficulty

concentrating and maybe had attention deficit disorder.  (Tr. 476).  Dr. Fernandez noted

that she seemed to be okay and her mood did not seem depressed, but plaintiff

complained she had been depressed lately because of the weather and because of her

---

[21]    Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety.  See www.nlm.nih.gov/medlineplus/druginfo

[22]    Buspar is a brand name for buspirone.  See www.nlm.nih.gov/medlineplus/druginfo.

[23]    Citalopram is used to treat depression. Citalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs).  See www.nlm.nih.gov/medlineplus/druginfo.

back.  (Tr. 476).  Dr. Fernandez referred plaintiff for attention deficit disorder testing. (Tr. 476).

Plaintiff was seen on June 16, 2006 by Dr. Tim Tinius for a neuropsychology consult at the request of Dr. Fernandez.  (Tr. 490).  Plaintiff reported that she was presently unemployed and had previously worked in food service and as a home health aide in a nursing home.  (Tr. 490).  She felt that her pain had become worse.  (Tr. 490). Plaintiff reported an accident in 2002 where she hit the back of her head, and another incident where she hit her head in September or October of 2002.  (Tr. 490).  Plaintiff also described an accident in 1971 where her left leg was cut by a silage auger, and a car accident in 1977.  (Tr. 490).  She had also been physically abused by the father of her children, and had been struck by lightning at age 13.  (Tr. 491-492).

Plaintiff stated that she got dizzy if she bent over, had periods where her arm and leg would freeze with lack of movement, had poor coordination and would fall down steps.  (Tr. 491).  She was easily frustrated with cooking even though she was a cook in her work, struggled with recall of information day-to-day, and was forgetful.  (Tr. 491). Her husband described her as having trouble with her memory, hyperactive, and not listening well.  (Tr. 491).  She sometimes became confused in the middle of a task.  (Tr. 491).

Based on his interview of plaintiff, review of records and testing, Dr. Tinius diagnosed plaintiff as follows:

Axis I:     Cognitive disorder not otherwise specified secondary to multiple concussions, probable learning disability, attention-deficit/hyperactivity disorder combined type, post-traumatic stress disorder, major depressive disorder, borderline intellectual functioning, alcohol abuse, rule out alcohol independence

28

Axis II:        Borderline personality disorder

Dr. Tinius determined that the results of psychological and neurophsychological testing indicated that plaintiff had borderline academic skills, consistent with a significant learning disability; severely impaired attention; severe problems with variability of processing, and was likely to become impulsive on task; memory and problem solving were impaired; and there were severe deficits with abstract concept formation.  (Tr. 495).  Dr. Tinius opined that the results were consistent with a significant level of cognitive deficits.  (Tr. 495).

Given her present deficits, Dr. Tinius indicated that he would support an application for Social Security Disability Insurance in that plaintiff could not work a minimum level job for 40 hours per week; the combination of learning problems, cognitive disorder, chronic pain, and the depression and borderline personality disorder would interfere with her ability to function in the social part of work and learn new job requirements.  (Tr. 495).  He stated that plaintiff could probably work a maximum of 15 to 20 hours a week, but it would be solely dependent on the chronic pain that she would experience.  (Tr. 496).

On August 30, 2006, plaintiff was seen by Dr. Fernandez.  (Tr. 520).  Plaintiff stated that she wanted surgery but that it was not advised, and that she was still somewhat depressed.  (Tr. 520).  Dr. Fernandez increased plaintiff's Citalopram.  (Tr. 520).

**C.    Hearing Testimony**

On June 28, 2006, plaintiff appeared and testified at the hearing before the ALJ. (Tr. 599).  Plaintiff graduated from high school and received a CNA certificate in 1984.

(Tr. 599).   Plaintiff felt that she could not work because she was clumsy and cannot function the way she used to; she lost her coordination due to a head injury in 2001 and did not function well anymore.  (Tr. 603).  Plaintiff never worked as a nursing assistant and ended up working in restaurants.  (Tr. 603).  She had a tendency to have an attitude problem.  (Tr. 603).  Physically, plaintiff's lower back hurt all the time, along with her arms and shoulders, and she had pain throughout her muscle areas.  (Tr. 604). After two hours on her legs, they swelled up and there was pain throughout her legs constantly; she could not stand on the foot that was injured in 1970.  (Tr. 604).  The pain was chronic and she woke up every two hours.  (Tr. 605).  She was diagnosed with fibromyalgia in 2002 or 2003.  (Tr. 605).

During a typical day, plaintiff did her household chores; her house has three stories and climbing up the stairs and keeping up the house is about all she could handle; most times her husband did the heavier activities like vacuuming or carrying things up and down the stairs.  (Tr. 606).  For exercise, plaintiff walked; the previous year she could walk about a half mile without problems, but this year she could only walk two blocks.  (Tr. 606).  It took plaintiff about 45 minutes to walk a half mile, and she would have to stop.  (Tr. 606).  Her lower back and legs hurt when she walked.  (Tr. 606).  Plaintiff testified that she rode a bicycle but that it has gotten bad in the past year and she could not go very far.  (Tr. 607).  She rode back and forth to the grocery store and her husband carried everything in his backpack.  (Tr. 607).  She could probably lift 10 pounds but not carry it around.  (Tr. 609).  She has not traveled since May 28, 2004. (Tr. 609).  She has problems with sitting, and stated that she did not really read or

watch television during the day.  (Tr. 610).  Plaintiff had not been drinking at all since she got out of jail.  (Tr. 611).

Plaintiff has had headaches, which have gotten more severe in the past year. (Tr. 609).  Plaintiff's pain was usually in the seven to nine range, and medications did not help too much.  (Tr. 612).  She felt that her head injury was also the cause of a lot of the problems she was having.  (Tr. 612).

Plaintiff had not tried working since she was injured, and just worked doing household chores.  (Tr. 612).  Plaintiff felt she could stand for somewhere between one and fifteen minutes, and she had a hard time lifting a gallon of milk.  (Tr. 613).  Making the bed in the morning was something she had trouble with.  (Tr. 613).  In the last ten years, plaintiff worked at Finger Hut as an inspector on her feet.  (Tr. 614).  Doing things at a moderate to fast pace was difficult for plaintiff, and she has to take her time.  (Tr. 614).  She used to read but has had trouble focusing and her eyes were bad.  (Tr. 614). Plaintiff did not think that she could function as a cashier, and did not feel that she could sit all day.  (Tr. 615).  Plaintiff rode the bus back and forth to the doctor's office or to get groceries.  (Tr. 615).  Plaintiff stated that she requested surgery on her neck and lower back, but that doctors said they could not do that.  (Tr. 617).  Plaintiff was found walking in July of 2004 and had some alcohol the day before, so the last time she really drank was July of 2004.  (Tr. 619).  Plaintiff reported that she was taking medicine for depression and seeing a psychologist once every three months.  (Tr. 625).

Plaintiff's husband also testified at the hearing before the ALJ.  (Tr. 619).  He testified that plaintiff struggled doing things during the day and he was afraid she would drop something.  (Tr. 620).  When they first met, plaintiff she would cook three-course

meals, but lately her arms were dragging and she wanted to do everything but he wished she would rest.  (Tr. 621).  It seems like she is always on the go and hyper.  (Tr. 621).  Plaintiff goes on walks and bikes with him.  (Tr. 622).

### D.   Activities of Daily Living

Plaintiff completed a function report on October 1, 2004.  (Tr. 139-146).  She reported that she got up at 10:30 a.m., made coffee, combed her hair, watched television and read the Bible.  (Tr. 139).  She sometimes made breakfast, took a hot bath, rode her bike to move her body, went with her husband to get groceries, watched her husband do things in the garage, cooked supper, and watched television.  (Tr. 139).  Before her condition, plaintiff worked very fast-paced jobs.  (Tr. 140).

Plaintiff indicated that her sleep was affected by her pain and she woke up three to four times during the night.  (Tr. 140).  It was difficult for plaintiff to reach up and back when getting dressed and for her to get out of the tub; she could sometimes care for her hair if she did not have to reach.  (Tr. 140).  She stated that walking was hard on her left foot, and that she stood on one foot while she cooked.  (Tr. 140).  Plaintiff prepared her own meals most of the time, but obtained help from her husband reaching things in cupboards and lifting.  (Tr. 141).

Since her illness began, plaintiff dropped things while cooking and had trouble with hand coordination and fatigue, weakness, and pain in her neck, arms, hands, legs and foot.  (Tr. 141).

Regarding household chores, plaintiff did light dusting and helped with making the bed; but chores take her longer than they used to.  (Tr. 141).  It was hard for plaintiff to do yard work.  (Tr. 142).  Plaintiff tried to walk and go for bike rides.  (Tr. 142).

Plaintiff shopped for groceries with her husband, mom, dad or her daughter.  (Tr. 142).

Plaintiff's hobbies and interests included music, movies, games, cooking, being with

friends, decorating, and challenging herself throughout the day.  (Tr. 143).  She did

these things when she felt up to it, depending on her strength and coordination.  (Tr.

143).

 For social activities, plaintiff went shopping, went on the bus, rode her bike with

her husband and played cards; on a regular basis she biked short distances with her

husband.  (Tr. 143).  Plaintiff stated that she was under doctor's orders not to exceed

ten pounds lifting, and that she could not do that at many times; she dropped things a

lot.  (Tr. 144).  She could walk a block or two without stopping to rest.  (Tr. 144).  She

could pay attention for a pretty normal amount of time, but sometimes had trouble

following spoken directions.  (Tr. 144).  She did not handle stress well and got confused

with changes in routine.  (Tr. 145).  Plaintiff used a TENS unit since 2002.  (Tr. 145).

 Plaintiff attached further remarks to her report which stated that she woke up in

the night with severe pain and stiffness throughout her arms, neck, shoulders, and

hands with numbness; she stumbled on her feet; it was hard for her to sit because of

pain from her neck to her tailbone; she had headaches, trouble concentrating, and

memory loss; riding in vehicles caused her pain and stiffness; she could not lift items;

she had weakness throughout the day, stiffness in her wrists when writing, and she had

lots of frustration with all of the tasks she tried to accomplish throughout the day.  (Tr.

154).

 Plaintiff also filed a number of handwritten statements regarding her activities of

daily living.  (Tr. 164, 182, 238, 239-255).  On February 2 and 3, 2005, plaintiff stated

that she awoke with very bad stiffness, made the bed, got brunch and did little things around the house; she was confused when making an omelet and almost cut off her finger because she had to study her body movements as she did ordinary tasks.  (Tr. 164-165).  She had become sloppy in her work and could barely sit on her chair because her tailbone sent shocks through her back.  (Tr. 165).  She has frustration, confusion, blurred vision, sensitivity to bright lights, and shoulder and arm pain throughout the day, and used to be able to write more but her symptoms worsened with that.  (Tr. 166-167).

On April 25, 2005, plaintiff wrote a letter to James Martin, Regional Commissioner.  (Tr. 182-200).  Plaintiff detailed her injury history, and stated that she no longer has normal days and does not have a normal night's sleep since she fell at a bank in 2001.  (Tr. 183).  She was crabby and forgot where and when she did things; she has headaches and got fatigued during the day.  (Tr. 190).  Her husband bought her an expensive bike so she could get some exercise; she stated she could walk some distance if she is not carrying anything.  (Tr. 191).  Her hand coordination was stiff and clumsy.  (Tr. 195).  She suffered from chronic pain when doing household chores, chronic fatigue, forgot things, and had trouble sitting or squatting.  (Tr. 197).  She stated that being refused social security benefits in 1992 has caused her to suffer all of the things that have happened since then.  (Tr. 199-200).

On June 13, 2005, plaintiff wrote a letter to the ALJ.  (Tr. 238).  She stated that she had jabbing and stabbing pains, pain and stiffness when she sat to do any writing or watch television, and has difficulty walking for enjoyment.  (Tr. 238).  Plaintiff's head injuries caused her awkward movements and she did not have any control of her

muscles; she had difficulty concentrating and focusing, and got angry and confused under pressure. (Tr. 238). She reported that she had not drank since August of 2004. (Tr. 238). Her arms and shoulders were constantly sore, she was weak and fatigued and her lower back hurt. (Tr. 238). She could not talk or communicate so that people could understand her the way she wanted them to, and she could not follow recipes or directions at times. (Tr. 238).

Plaintiff wrote another letter "to the people at social security," which is undated although it is marked as having been received on June 1, 2006. (Tr. 239). Plaintiff stated that since her two major falls in December of 2001 and March of 2002, her symptoms have become worse. (Tr. 240). She stated that her doctors would not perform surgery. (Tr. 241). She continually got worse; her hands cramped up, her arms had no muscle, and her lower back bothered her when she sat. (Tr. 242). She could not hold a job. (Tr. 243). Her doctor has run out ways to help her and she was suffering headaches that she felt were due to the two falls. (Tr. 245). Plaintiff fell down in front of a bank in 2001 and at the jail in 2002. (Tr. 245-246). She felt that the bank should at least pay for the pain and suffering and for causing her all this difficulty. (Tr. 247).

Plaintiff submitted another statement, which is also undated but marked as having been received June 1, 2006. (Tr. 248). Plaintiff stated that she took her CNA but because of back and neck problems she was unable to do the job requirements. She worked at the cafeteria at St. Benedict's Center, and had such bad pain in her legs she had to crawl her way up to the last floor. (Tr. 248). After the accident at the bank, plaintiff was fired from her job at Aramark at St. Cloud State University because she

could not perform the job requirements.  (Tr. 252-253).  She was getting worse with pain all the time.  (Tr. 254).

On October 5, 2004, plaintiff's husband completed a third-party function report. (Tr. 155-163).  He described plaintiff's daily activities as making coffee, personal hygiene, walking to the bus stop for appointments, light dusting and no heavy lifting house chores, periodic use of the TENS unit for pain, laying down to rest, following a low-carb diet religiously, washing dishes and cleaning up.  (Tr. 155).  He stated that he helped her with anything heavy or too high to reach, helped prepare meals, put the dishes away, and lifted anything over five pounds.  (Tr. 156).  Plaintiff had trouble getting out of the tub after a bath and putting her TENS unit patches on parts of her back.  (Tr. 156).  Plaintiff had reduced the amount of food she prepared in a frying pan to decrease the weight.  (Tr. 157).  When she was fatigued, he helped with the cooking. (Tr. 157).  Plaintiff swept floors, dusted, and wiped tables, chairs, the countertops and the stove.  (Tr. 157).  Plaintiff did chores all day throughout the day, taking breaks for miscellaneous tasks.  (Tr. 157).  Plaintiff had a positive outlook and sometimes indulged in too much steady work and needed to be told to take a break.  (Tr. 157).

Plaintiff's husband reported that plaintiff usually went outside every day to walk or bike.  (Tr. 158).  She shopped for groceries, household goods, clothing and personal items.  (Tr. 158).  He stated that her hobbies were reading, walking, relaxation music, television or movies, collecting trinkets and knickknacks, decorating and caring for plants.  (Tr. 159).  He described plaintiff as ambitious and having a hard time letting go of the things she used to be able to do.  (Tr. 159).

With other people, plaintiff talked, visited her family and friends, played cards, went to the grocery store and mall to shop. (Tr. 159). Plaintiff could only lift 10 pounds, stand for 45 minutes, could not reach above her shoulders, could not walk or sit for more than half an hour at a time, and could not climb stairs for more than five minutes at a time. (Tr. 160). He reported that plaintiff had to rest for a couple of minutes after five minutes of walking if she was carrying anything while walking. (Tr. 160). He stated that plaintiff followed spoken instructions pretty well, and that she handled stress badly. (Tr. 160-161).

Plaintiff's husband completed another third-party function report on April 3, 2005. (Tr. 173-180). He described plaintiff's day as waking up, turning on the television, reading the Bible, running bath water and taking a bath with his help, fixing her hair, making something for breakfast, eating, and taking her medication. (Tr. 173). He stated that plaintiff could not cook as accurately or as fast as she could before her illness. (Tr. 174). Plaintiff seldom got more than four hours of sleep. (Tr. 174). Plaintiff took a long time to get dressed and had difficulty with clothing; her arms and shoulders gave out as she cared for her hair; and she had tailbone pain while sitting in the tub. (Tr. 174). Plaintiff prepared meals at least once a day; it was hard to tell if there were changes in cooking habits. (Tr. 175). He stated that plaintiff thought she was not doing enough but was doing more than she should be. (Tr. 175). Plaintiff washed dishes every day and cooked; each day she did something different depending on whether her body could handle it. (Tr. 175). She wanted to do her share of the work load and did what she could. (Tr. 175). She did not do yard work because it would be too difficult with kneeling, reaching and lifting. (Tr. 176). Plaintiff went outside almost every day

unless the weather was bad; she walked, rode a bicycle, rode in a car, and used public transportation.  (Tr. 176).  Plaintiff shopped for household items, groceries, clothing, furniture, and health care products.  (Tr. 176).  Plaintiff handled the financial work to make up for what she could not do.  (Tr. 177).

Her hobbies and interests were cooking, bird watching and wild life, reading and music; she enjoyed relaxation in a nature setting and liked walks.  (Tr. 177).  Plaintiff spoke with her mother on the phone, occasionally shopped with her daughter and sometimes played cards with family and friends.  (Tr. 178).  Plaintiff could lift five pounds, could not raise her arms above shoulder height, and could not squat, kneel or climb stairs.  (Tr. 178).  She could walk 6-7 blocks before resting.  (Tr. 178).

Plaintiff did not always understand spoken instructions.  (Tr. 178).  Plaintiff's husband stated that plaintiff suffered from severe neck pain, she dropped things very often and her arms gave out, she could not sit down for very long because she had to shift her position, she took a lot of pain relievers but none helped much at all.  (Tr. 180).  He and plaintiff went out walking or biking on short trips to reduce the stiffness in her body.  (Tr. 181).

Plaintiff's husband also submitted a handwritten statement, which is undated.  (Tr. 168-172).  He stated that plaintiff could not lift more than 5 pounds, has problems with her wrists, neck, elbows, shoulders and left leg.  (Tr. 168).  If plaintiff pushed herself, after about 20-30 minutes she would have to sit down and rest.  (Tr. 168-169).  During the day, she got up to walk because she was stiff; she fixed breakfast and cooking was her pride and joy.  (Tr. 169).  Plaintiff became fatigued from simple tasks

such as lifting a pan and became frustrated.  (Tr. 169).  She stood on one leg because of her left leg pain.  (Tr. 171).

    **D.**    **VE's Testimony**

The ALJ presented the VE with a hypothetical woman who is a younger individual with the same educational and vocational background as plaintiff; with the severe impairments of degenerative disk disease of the lumbar sacral and cervical spine, bilateral carpal tunnel syndrome, bilateral rotator cuff disease, status post-bilateral carpal tunnel release surgery, fibromyalgia syndrome, cellulitis of the right ankle, a history of amputation of the left foot, chronic pain syndrome, a major depressive disorder and alcoholism; that the combination of impairments limited that woman to light work; with an hourly sit/stand option to stretch for a brief period of one or two minutes; occasional climbing of stairs or ramps; no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, bending, twisting; no crouching or crawling; no exposure to ice or dangerous moving machinery due to side effects of medications; occasional overhead reaching with both arms; occasional firm gripping or grasping with both hands; with the work limited to unskilled, entry-level work with brief and superficial contact with the public, coworkers and supervisors, performed in an alcohol-free workplace.  (Tr. 627-628).

The VE testified that plaintiff's past relevant work would be ruled out.  (Tr. 628).  However, he stated there would be other work in the State of Minnesota that plaintiff could do, such as routing clerk, which is unskilled and light, mail clerk and inspector hand packager.  (Tr. 628-629).  The ALJ then further reduced the RFC to the sedentary level.  (Tr. 629).  The VE testified that there would be jobs at the sedentary level such

as an addresser, multi-focal lens assembler, food and beverage order clerks.  (Tr. 629).

The ALJ again reduced the RFC to limit standing to no more than 15 minutes, lifting no

more than five pounds occasionally or frequently, with no bending, twisting, stooping or

reaching above shoulder level, no sitting for more than 10 minutes, and no continuous

walking for more than 20 minutes.  (Tr. 629).  The VE opined that based on that

combination of restrictions, the person would not be employable at any jobs.  (Tr. 630).

The VE also stated that the standard of being absent from work before being terminated

was two days a month, and that only working 15 hours per week would not be

considered substantial gainful employment.  (Tr. 630).

## VI.    DISCUSSION

### A.    <u>Weight of Opinion of Treating Physician</u>

On appeal, plaintiff first contended that the ALJ failed to accord adequate weight

to the opinion of her treating physicians.   Specifically, plaintiff claimed that the ALJ

dismissed and gave no weight to the opinion of Dr. Richard Linares made in July of

2005.

On July 20, 2005, Dr. Linares wrote a letter on behalf of plaintiff stating that she

had chronic fibromyalgia, chronic degenerative joint disease of the cervical spine, and

chronic low back pain with associated significant spinal stenosis with radiating pain to

her lower extremities.  (Tr. 411).  Dr. Linares recommended restrictions for plaintiff of no

prolonged standing from 1-15 minutes, no lifting over 5 pounds, no bending, twisting or

stooping, no reaching above shoulder level, no sitting for longer than 10 minutes and no

walking for over 20 minutes.  (Tr. 411).

The ALJ found that Dr. Linares's opinion was not well-supported, was inconsistent with the overall weight of the other evidence of record, and that it was given at the claimant's direct request.  (Tr. 26).  The ALJ noted that Dr. Linares had not performed an examination on the date the opinion was given, and that while he listed pain as plaintiff's primary limitation, his own records and other records reported the claimant to be in no acute distress.  (Tr. 26).  Additionally, the ALJ stated that Dr. Linares's own records and other records revealed good strength and were absent for objective testing to support the specific limitations on lifting, time-on-feet and sitting. (Tr. 26).

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)).  Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527.  In according weight to medical opinions, the ALJ should consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record."  Leckenby v.

Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R. § 404.1527(d) (2)).  Absent these two requirements, the ALJ need not accord controlling weight to a treating physician's opinion and the ALJ may not give a treating physician's opinion controlling weight based solely on the fact that he or she is a treating physician.  Prosch, 201 R.3d at 1013.

The first two factors in evaluating the weight to accord a physician's opinion are the length, nature, and extent of the treatment relationship.  Here, the record shows that Dr. Linares was plaintiff's primary physician, who treated her regularly for all of her ailments.

Regarding the quantity of evidence in support of the opinion and the consistency of the opinion with the record as a whole, the Court finds that there is substantial evidence in the record as a whole to support the ALJ's decision not to give Dr. Linares's opinion controlling weight.   The functional capacity assessment performed by Dr. Chisholm on November 4, 2004, determined that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and walk for a total of six hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and that she was limited in her upper extremities for pushing and pulling.  (Tr. 373).  Dr. Chisholm also determined that plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and occasionally climb ladders, ropes and scaffolds; she was limited in gross manipulation and handling, had no visual limitations or communicative limitations, and was to avoid even moderate exposure to hazards such as machinery and heights.  (Tr. 375-376).  On June 15, 2005, plaintiff was examined by Dr. James Johanson, who noted that she was slow with flexion and extension, but also found that it was full and

she had full rotation, and her muscle testing showed 5/5 strength in all extremities. (Tr. 415). On April 6, 2006, Aaron Sufka, a physical therapist, noted that plaintiff was functional and had good flexion and rotation of the lower trunk without pain interference. (Tr. 480).

More importantly Dr. Linares's functional assessment was inconsistent with his own notes. Dr. Linares recommended restrictions of no prolonged standing from 1-15 minutes, no lifting over 5 pounds, no bending, twisting or stooping, no reaching above shoulder level, no sitting for longer than 10 minutes and no walking for over 20 minutes. (Tr. 411). However, throughout the relevant time period, Dr. Linares's notes indicated that plaintiff had full range of motion in her neck (Tr. 422, 419-420, 403); plaintiff was very mobile (Tr. 419-420); plaintiff had 5/5 strength (Tr. 419-420, 516); plaintiff walked erect without any difficulty (Tr. 383, 519); plaintiff reported high levels of pain yet did not appear to be in any significant degree of distress, and was otherwise fairly mobile and not walking around with difficulty (Tr. 403); and plaintiff carried a purse and bag into his office and was able to bend over and pick up the bag without any visible difficulty . (Tr. 403).

Where a treating physician's notes are inconsistent with his residual functional capacity assessment, the residual functional capacity assessment is not entitled to controlling weight. Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) citing Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); see also Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (rejecting treating physician's opinion on RFC where his treatment notes did not mention such serious limitations and the limitations were inconsistent with treating physician's recommended rehabilitation regime).

In summary, neither Dr. Linares's treatment records, nor the balance of the records, support Dr. Linares's restrictive functional capacity assessment. As such, Dr. Linares's opinion regarding plaintiff's restrictions is not entitled to controlling weight.

**B.     The RFC Determination**

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. Id. The RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'" Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). However, the ALJ is not limited solely to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional." Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).

Plaintiff asserted that the ALJ's residual functional capacity findings were not supported by substantial evidence on the record as a whole because the ALJ erred in finding plaintiff's subjective complaints to be not credible. Pl. Mem., p. 4. Specifically, plaintiff claimed that the ALJ failed to adequately address the factors found in SSR 96-

7p.  Pl. Mem., p. 4.  Plaintiff further argued that the ALJ failed to address whether she had an underlying medically determinable impairment that could reasonably be expected to produce the symptoms alleged, and in evaluating her symptoms, made only a passing reference to her testimony.  Pl. Mem., p. 4.

Failure to give some consideration to a claimant's subjective complaints is reversible error.  Brand v. Secretary of the Dept. of Health, Educ. and Welfare, 623 F.2d 523, 525 (8th Cir. 1980).  "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding."  Id.  An ALJ must consider a claimant's subjective complaints, regardless of whether they are corroborated by objective medical findings.  Id.; see also Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991).  On the other hand, "we will not substitute our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility."  Id. (citing Woolf, 3 F.3d at 1213).

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1.     the claimant's daily activities;

2.     the duration, frequency, and intensity of the pain;

3.     precipitating and aggravating factors;

4.      dosage, effectiveness, and side effects of medication; and

5.      functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207.  These factors are virtually the same factors found in SSR 96-7p (directing the ALJ to evaluate the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson, 87 F.3d at 1017 (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).  "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 207.  If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth

the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Cline, 939 F.2d at 565.  On the other hand, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.  See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations); Cox, 160 F.3d at 1207 (finding the ALJ must take into account, but does not need to discuss how each factor relates to plaintiff's credibility) (citation omitted).

The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of plaintiff's subjective complaints.  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

As a preliminary matter, this Court observes that contrary to plaintiff's claim that the ALJ failed to address whether she has an underlying medically determinable impairment that could reasonably be expected to produce the symptoms she alleged or her testimony regarding her impairments, the ALJ did find that plaintiff had the severe impairments including fibromyalgia or chronic pain syndrome, degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome status-post release surgeries, a history of left foot Achilles laceration and repair and recent cellulitis, left

shoulder degenerative disease, alcoholism and depression.   (Tr. 20).   This finding established that plaintiff had medically determinable impairments that could reasonably be expected to produce plaintiff's pain.   See Wiley v. Astrue, 2008 WL 110892 at *3 (D.Kan. Jan. 7, 2008) (rejecting plaintiff's contention that the ALJ failed to properly analyze the credibility of plaintiff's complaints of pain because he did not clearly find that there was an underlying medically determinable impairment that could reasonably be expected to produce plaintiff's pain where ALJ found that plaintiff suffered from arthritis, bilateral carpal tunnel syndrome, obesity, a hernia and the residual effects of colon surgery and colostomy).

Similarly, with respect to plaintiff's assertion that the ALJ failed to adequately address the factors found in SSR 96-7p, the Court notes that the ALJ explicitly referred to both SSR 96-7p and Polaski, and then relying on those factors, explained how the objective medical evidence and treatment record, plaintiff's reports of daily activities, treatment and side effects, and work history were inconsistent with impairments of disabling severity or duration.   (Tr. 24-27).   That said, it is the finding of this Court, based on its review of the record, there is substantial evidence in the record as a whole to support the ALJ's decision to discredit plaintiff's subjective complaints of disabling pain.

The first Polaski factor requires consideration of the claimant's daily activities. Plaintiff reported to Dr. Godding that she performed her activities of daily living independently and thought she could live independently with help.   (Tr. 350).   Plaintiff testified before the ALJ that she walked for exercise and rode a bicycle, and that during a typical day, she did her household chores.   (Tr. 606-607).   Plaintiff also testified that

she sometimes biked to the grocery store with her husband, and took the bus back and forth to the doctor's office and to get groceries.  (Tr. 607, 615).  In addition to this trial testimony, on October 1, 2004, plaintiff completed a function report, which stated that on a typical day she made breakfast, rode her bike, went to the grocery store with her husband, cooked supper, and watched television.  (Tr. 139).  Regarding household chores, she stated that she did light dusting and helped make the bed.  (Tr. 141).  She walked and went for bike rides.  (Tr. 142).  Her hobbies included music, movies, games, cooking, being with friends, decorating and challenging herself throughout the day.  (Tr. 143).  For social activities, plaintiff stated that she went shopping on the bus, biked short distances with her husband on a regular basis, and played cards.  (Tr. 143).  In a letter plaintiff wrote to the Regional Commissioner in April 2005, she stated that she biked and could walk some distance if she was not carrying anything.  (Tr. 191).

In October 2004, plaintiff's husband completed a third-party function report and stated that plaintiff made coffee, walked to the bus stop for appointments, did light dusting, washed dishes and cleaned up.  (Tr. 155).  He also stated that plaintiff swept floors, dusted, and wiped tables, chairs, the countertop and the stove, and that plaintiff did chores all day throughout the day, taking breaks for miscellaneous tasks.  (Tr. 157).  He stated that plaintiff sometimes indulged in too much steady work and needed to be told to take a break.  (Tr. 157).  Plaintiff's husband reported her activities as walking and biking, shopping at the grocery store and the mall for groceries, household goods, clothing and personal items, reading, collecting trinkets and knickknacks, decorating and caring for plants.  (Tr. 159).  In a second third-party function report dated Arpil 3, 2005, plaintiff's husband stated that plaintiff washed dishes every day and cooked (Tr.

715); that she walked, rode a bicycle, rode in a car and used public transportation (Tr. 176); that she shopped for a variety of items (Tr. 176); and that he and plaintiff went out walking or biking.  (Tr. 181).

This level of engagement in daily activities was also borne out in the medical records.  For example, on December 30, 2005, plaintiff reported to Dr. Fernandez that she kept herself busy by walking and doing household chores.  (Tr. 392).  On January 6, 2006, plaintiff reported to Dr. Holberg that she exercised daily with a walking program and she rode the bus regularly.  (Tr. 390).  Dr. Holberg recommended regular exercise. (Tr. 391).

The Court finds that the ALJ did not err in discrediting plaintiff's subjective complaints of pain.  Although plaintiff does not need to establish that she is bedridden to be disabled, a claimant's credibility regarding subjective complaints of pain, fatigue, and depression can be undermined by daily activities.  See Haley v. Massanari, 258 F. 3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (concluding that the credibility of claimant's allegations of disabling pain was undermined by his daily activities, including caring for

children, driving, and occasional grocery shopping).  Here, plaintiff engaged in a wide array of activities during the time frame in which she alleged she was suffering from disabling pain, fatigue and depression, including cooking, taking daily walks, riding her bike, shopping, and attending to household chores.  Plaintiff scheduled an appointment around a day where she had too many activities to do.  (Tr. 475).  These reports render plaintiff's complaint that her condition precludes her from engaging in substantial gainful employment less than credible.

Second, with respect to the duration, frequency, and intensity of the pain, the ALJ observed that while there were reports of multiple tender points indicative of fibromyalgia, physical examinations were good as to movement, gait and strength, neurological findings were normal or minimal, and that plaintiff was in no acute distress despite rating her pain from 7 to 9 on a scale of 10.  (Tr. 24).  These observations are borne out by this Court's review of the records.

On July 16, 2004, plaintiff complained of pain to her tailbone area because she had fallen off of her bike twice a couple of weeks prior.  (Tr. 300).  However, the physical examination of plaintiff indicated that she was in no acute distress; she was ambulatory; her head was normal, nontender and atraumatic; her neck was supple; there was some mild diffuse cervical spine tenderness in her cervical spine and she had full range of motion to the cervical spine with mild tenderness.  (Tr. 301).  There was no trauma or deformity noted of the lumbar spine, but there was some diffuse midline lumbar spine tenderness to palpation.  (Tr. 301).  The lumbar spine x-rays and a CT scan showed that there was no fracture.  (301).

On November 2, 2004, plaintiff reported her pain as a 7 for her low back, neck and shoulder, however, she did not appear to be in any acute distress.  (Tr. 421).  Plaintiff had full range of motion in her neck, mild tenderness over the cervical spine, but no significant muscle spasms, and decreased range of motion in her left shoulder because of pain, along with tenderness.  (Tr. 422).  No significant spasm was noted on examination of the back.  (Tr. 422).

On December 7, 2004, plaintiff reported her pain as a 6, but Dr. Linares noted that she seemed very casual, smiled, was very mobile and did not appear to be in any significant distress.  (Tr. 419).  Dr. Linares indicated she had full neck rotation with some tenderness to palpation over the cervical spine.   (Tr. 419-420).   Motor examination in the upper and lower extremities revealed 5/5 strength and grip in both hands and elbows, and 5/5 strength, flexion and extension in her lower extremities.  (Tr. 420).

On June 15, 2005, plaintiff complained of significant pain, yet had 5/5 muscle testing and full flexion, extension and rotation.  (Tr. 415).  On September 30, 2005, Dr. Linares noted that while plaintiff reported her pain as an 8, she did not appear to be in any significant distress and was otherwise mobile and was walking without difficulty.  (Tr. 403).  Dr. Linares also noted that she was carrying her purse and a bag into the office and that she was able to bend over and pick up the bag without any visible difficulty, and that she had fairly good range of motion.  (Tr. 403).

On March 14, 2006, plaintiff reported a pain scale of 9, yet Dr. Linares noted that plaintiff walked erect around the office without difficulty and did not appear to be in any significant distress.  (Tr. 383).

On March 29, 2006, plaintiff saw Dr. Nguyen.  (Tr. 382).  Plaintiff reported a fall in December and cracked her shoulder and rated her pain as a 7 with burning, but was observed to be in no discomfort, had full range of motion and good strength in her left shoulder upon examination, and the x-rays showed no acute fracture or dislocation, moderate degeneration in the AC joint.  (Tr. 382).

On April 6, 2006, plaintiff saw Aaron Sufka, a physical therapist, and stated that her lower back, arms and shoulders, and muscle areas hurt all the time, and that her pain was usually in the seven to nine range, and medication did not help her too much. (Tr. 604, 612).  Sufka noted that plaintiff had good flexion and rotation of the lower trunk without pain interference.  (Tr. 480).

Based this record, the Court finds that plaintiff's reports regarding the intensity and severity of her pain are rendered less than credible by physicians' observations that she did not appear to be in significant or acute distress despite high pain ratings, that she moved without difficulty, her strength was good, she had full ranges of motion and flexion, and she was able to pick up and carry items without difficulty.

The third Polaski factor analyzes precipitating and aggravating factors.  There is not much information in the record regarding these factors.  Plaintiff stated that she had pain when doing household chores (Tr. 197), and that sitting down for long periods worsened her back pain (Tr. 383).   However, the record evidences that plaintiff continued to perform household chores daily, and that she described reading, watching television and movies as hobbies.

The fourth factor addresses the dosage, effectiveness, and side effects of medication.  The ALJ acknowledged some credible degree of pain, but observed that

medical reports revealed improvement with use of a TENS unit and medication. (Tr. 25). In addition, despite plaintiff's report of medication side effects, he stated that the record showed that plaintiff's physicians either discontinued or changed her medications when side-effects were reported.  (Tr. 25).

The record shows that over the course of her treatment, plaintiff had taken numerous muscle relaxants and pain medicine, including Flexeril, Gabapentin, Methadone and Cyclobenzaprine.  There is nothing in the record indicating that plaintiff reported suffering adverse side effects from any of the pain medications.  Plaintiff also took several different medications for her mental health.  Plaintiff had been taking Nortriptyline, but discontinued it herself.  (Tr. 408).  Dr. Fernandez placed plaintiff on Buspar for anxiety, but when plaintiff complained that Buspar sedated her too much, Dr. Fernandez changed her medication to Citalopram.  (Tr. 400).  The record supports the ALJ's finding that to the extent plaintiff suffered any side effects, plaintiff's physicians discontinued or changed her medication.

Finally, the ALJ properly considered functional restrictions for plaintiff.  While the medical record documented problems with sitting only occasionally and plaintiff was able to sit through the hearing in no apparent discomfort, the RFC allowed for a change of position every one half hour.  Additionally, the ALJ addressed in the RFC the impairments to plaintiff's lumbar and cervical spine, shoulder, hand and foot by putting in place lifting restrictions, postural limitations, limitations on overhead reaching, gripping, standing and walking.  As such, the Court finds that the ALJ properly addressed her functional restrictions

The Court finds that the ALJ thoroughly addressed the <u>Polaski</u> factors in his determination that plaintiff's testimony was inconsistent with her allegations of disability, and that he sufficiently detailed the inconsistencies and his reasons for discrediting her testimony.  Accordingly, the Court finds that the ALJ did not err in discrediting plaintiff's subjective complaints of pain.

## C.    Fibromyalgia

Finally, plaintiff claimed that the ALJ failed to comply with the commissioner's policies in evaluating the severity of plaintiff's fibromyalgia.  Pl. Mem., p. 5.  Specifically, plaintiff maintained that the ALJ made an error of law by failing to give any credibility to the consultative psychological evaluations of Dr. Godding and Dr. Tinius, which she argued established that plaintiff had symptoms of fibromyalgia that were disregarded by the ALJ.  Pl. Mem., p. 5.  According to plaintiff, they both identified symptoms of and problems associated with fibromyalgia including: problems with concentration, attention, memory and cognition; pain and sleep loss; learning disability; borderline intellectual functioning; low energy and difficulties in memory and concentration.  Pl. Mem., p. 5 (citing to the Center for Disease Controls definition for fibromyalgia).[24]

Fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling.  <u>Garza v. Barnhart</u>, 397 F.3d 1087, 1089 (8th Cir. 2005).  Here, the ALJ found plaintiff's fibromyalgia to be a severe impairment and took it into account when determining plaintiff's RFC.  In so doing, the Court observes that there is nothing in the

---

[24]    The Court notes that although plaintiff has cited to the CDC definition of fibromyalgia as including the listed symptoms, the Court is unable to locate such a definition.  <u>See</u> www. http://www.cdc.gov/arthritis/arthritis/fibromyalgia.htm.  The Court further observes that the full criteria for the classification of fibromyalgia does not include these symptoms.
<u>See</u> http://www.rheumatology.org/publications/classification/fibromyalgia.

decision of the ALJ to suggest that he discredited or gave reduced weight to Dr. Godding's opinion regarding the factors plaintiff contends are associated with fibromyalgia.  In fact, the opposite is true.

On December 7, 2004, plaintiff was evaluated by Dr. Godding per the request of the Department of Economic Security.  (Tr. 347-351).  Dr. Godding noted that plaintiff did not evidence thought disorder or delusional thinking.  (Tr. 347).  He did find that her mood was depressed, and her affect was frustrated, flat and irritable, but indicated that her score on the BDI-II test for depression was inconsistent with his behavioral observations and interview data, and that she presented as suffering from many more depressive symptoms than were indicated by the testing.  (Tr. 348).  Dr. Godding noted that plaintiff's concentration and attention span were somewhat impaired by pain, chronic loss of sleep and depressed mood, but at the same indicated that there was ample evidence that she had the ability to comprehend instructions.  (Tr. 348, 351).  As to her ability to respond appropriately to co-workers and supervisors, he found that she got along well with others and reported that she liked her jobs.  (Tr. 351).  Regarding her ability to tolerate stress in the work place, he indicated that she had limited ability to tolerate stress due to the fact that her pain distracted her.  (Tr. 351).  Dr. Godding assigned plaintiff a GAF score of 55 which indicated moderate symptoms.

The ALJ explicitly acknowledged Dr. Godding's findings regarding concentration and attention and his opinion that plaintiff was able to comprehend instructions, but had a limited ability to tolerate stress.  (Tr. 22, 23, 27).  Based on those findings and opinion, and to address her moderate difficulty in maintaining concentration, persistence and pace, the ALJ limited plaintiff's interpersonal contacts to brief and superficial, and

restricted her to unskilled work.  (Tr. 26, 27).  As such, plaintiff's argument that the ALJ erred by discounting Dr. Godding's opinions is neither supported by the record nor persuasive.

The ALJ did discount the opinion of Dr. Tinius that plaintiff could not work, on grounds that they were not to be well-supported by the evidence.  (Tr. 21).  Dr. Tinius stated that the results of plaintiff's psychological and neuropsychological testing indicated that plaintiff had borderline academic skills, consistent with a significant learning disability; severely impaired attention; severe problems with variability of processing, and was likely to become impulsive on task; her memory and problem solving were impaired; and there were severe deficits with abstract concept formation.  (Tr. 495).  Dr. Tinius concluded that these test results were consistent with a significant level of cognitive deficits.  (Tr. 495).  Dr. Tinius then opined that plaintiff could not work a minimum level job for 40 hours per week, and that the combination of learning problems, cognitive disorder, chronic pain, and the depression and borderline personality disorder would interfere with her ability to function in the social part of work and learn new job requirements.  (Tr. 496).

The ALJ found there was no medical evidence of a brain injury to support a secondary cognitive disorder, and that the existence of a learning disability, attention deficit disorder and/or borderline functioning was not consistent with plaintiff's ability to complete high school with a self-reported B average, the ability to complete some vocational school, and her ability to perform skilled work.  (Tr. 21).  The ALJ further noted that Dr. Tinius opinions were not well-supported by other activities such as her ability to complete multi-page reports and letters in connection with her claims.  (Tr. 21).

The ALJ also noted that no other treating or examining sources had diagnosed or noted less than average intelligence, and that Dr. Tinius himself noted that plaintiff's scores may have been due to lowered lack of effort.  (Tr. 21).

The Court finds that the ALJ properly assigned reduced weight to Dr. Tinius's opinion.  Dr. Tinius met with plaintiff one time.  "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'"  Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).   Furthermore, while plaintiff reported closed-head injuries, the CT scan on July 30, 2004 found no evidence for acute infarct, hemorrhage, mass or mass effect.  (Tr. 343).  Additionally, there is no other mention in the record that plaintiff had less than average intelligence, nor any reference to any learning disability, attention deficit disorder or borderline functioning.   In fact, Dr. Godding estimated plaintiff's IQ to be average based on her vocabulary, educational history and activities.  (Tr. 348).  Dr. Marty, the rheumatologist who assessed plaintiff's fibromyalgia in 2004, made no mention of any mental symptoms associated with plaintiff's fibromyalgia.

The Court finds that the ALJ properly evaluated the opinions of Drs. Godding and Tinius in assessing plaintiff's fibromyalgia as a severe impairment.

### D.    Impact of Records Submitted to Appeals Council

On November 27, 2006, plaintiff sent a Request for Review of Hearing Decision/Order, and included medical evidence generated both before and after the date of the hearing before the ALJ.  (Tr. 9, 12, 504-592).  As defendant correctly observed, plaintiff did not rely on this additional evidence in her motion for summary

judgment, and as such she has waived judicial review of any such argument.   Def.'s Mem., p. 25 (citing <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 n. 2 (8th Cir. 2006) ("A party's failure to raise or discuss an issue in his brief is to be deemed abandonment of that issue") (citation and internal quotes omitted)).   Nevertheless, for completeness, this Court will briefly address this additional evidence.[25]

On May 16, 2005, plaintiff was seen by Betty Barrett, Clinical Nurse Specialist, at the VA in St. Cloud for a mental health evaluation.   (Tr. 532).   Plaintiff reported depression related to medical problems and stated that she was having problems obtaining social security disability.  (Tr. 532).  Plaintiff also reported a happy mood most days, and rated herself as a 6 on a scale of 0 to 10, with 0 indicating severe depression and 10 indicating euphoria.    (Tr. 533).    Plaintiff also stated that she cleaned compulsively.  (Tr. 533).  Plaintiff reported a history of closed-head injuries in 2001 and 2002, and loss of consciousness in 2002 due to a fall.  (Tr. 535).  Plaintiff's speech was clear, coherent and fluent, she was alert and oriented.  (Tr. 536).  Her score on the Beck Depression Inventory indicated severe symptoms of depression; Barrett noted that plaintiff's written responses varied from her verbal report of her mood.   (Tr. 536). Barrett gave the following diagnosis:

| | |
|---|---|
| Axis I: | Depression, not otherwise specified; anorexia nervosa, purging type, in remission; alcohol dependence in remission |
| Axis II: | Deferred |

---

[25]    The Court notes that some of the evidence that was newly submitted to the Appeals Council dates between 1989 and 1994, which is prior to plaintiff's period of disability under consideration here.  (Tr. 504-515).  As such, the Court will not consider that evidence in making the determination of whether the ALJ's decision is supported by the record.

Axis III:      Pain neck/cervicalgia; pain low back; pain arm, leg, hand, and foot; fibromyalgia; disorder of bursa and tendons in shoulder region; boil; varicose veins, leg; intevertebral disk disease

Axis IV:      Concern regarding daughter's behavior; financial stresses; chronic medical problems; chronic pain

Axis V:       GAF: 51

(Tr. 537).

On June 17, 2005, plaintiff saw Dr. Nguyen, a physician at the St. Cloud VA, for an injection in her left shoulder. (Tr. 538). Plaintiff also stated that she had pain in her back and shoulder, and Dr. Nguyen found hypersensitive areas consistent with fibromyalgia. (Tr. 538). He referred plaintiff to occupational therapy for myofascial therapy. (Tr. 538).

On June 29, 2005, plaintiff was seen for a psychology consult by Dr. Patricia Sohler at the in St. Cloud VA. (Tr. 527). Plaintiff reported that she spent her free time biking, walking and cooking. (Tr. 529). Plaintiff also reported problems with depression, but linked it to concerns about her financial situation; plaintiff complained that she should be getting social security, but for some reason has been prevented from doing that even though she is unable to work. (Tr. 529). She stated she was depressed about her inability to work and her clumsiness that she felt resulted from her head injury. (Tr. 529). Plaintiff estimated that she got three to four hours of sleep per night. (Tr. 530). Plaintiff reported that she was constantly cleaning. (Tr. 530).

Dr. Sohler stated that plaintiff had been administered the MMPI-2 and the MCMI-III, and that she achieved scores that indicated she approached the testing in a manner that overstated psychopathology. (Tr. 531). Thus, Dr. Sohler felt the results could not

be considered a valid approximation and therefore would not be interpreted.  (Tr. 531).

Dr. Sohler diagnosed plaintiff as follows:

| | |
|---|---|
| Axis I: | Anxiety disorder, not otherwise specified |
| Axis II: | Personality disorder, not otherwise specified, with paranoid and borderline features |
| Axis III: | Physical pain and complaints of memory problems, clumsiness, and dizziness |
| Axis IV: | Stress related to financial concerns and unemployment and physical problems |
| Axis V: | GAF: 50 |

(Tr. 531).  Dr. Sohler also opined that it was possible plaintiff had some attention deficit disorder.  (Tr. 532).

Plaintiff saw Dr. David Fey at the Minneapolis VA for an orthopedics consult on May 22, 2006.  (Tr. 523).  Dr. Fey noted that plaintiff moved throughout the room with no clear difficulty, and that she had normal physiologic and symmetric reflexes of bilateral lower extremities.  (Tr. 524).  Dr. Fey's impression was chronic, severe low back pain with radiation into the right thigh.  (Tr. 524).  Plaintiff mentioned she would be interested in an implantable TENS unit.  (Tr. 524-525).

Dr. Linares saw plaintiff for a follow-up on June 16, 2006.  (Tr. 521).  Plaintiff reported a pain scale of 9/10, though Dr. Linares noted that she did not appear to be in any significant degree of distress.  (Tr. 521).  Dr. Linares noted that he had nothing else to offer plaintiff from a medical standpoint.  (Tr. 521).  Dr. Linares also stated that plaintiff seemed to have a fairly well preserved activity level and seemed to function fairly well, and that plaintiff told him that sometimes she rides a bike.  (Tr. 521).  Dr. Linares continued plaintiff's pain management.  (Tr. 521).

On August 14, 2006, plaintiff called nursing triage at the VA in St. Cloud complaining she was in pain and could hardly walk.  (Tr. 585).  Plaintiff reported she was having difficulty ambulating on her right leg, and rated her pain as 10/10.  (Tr. 585).  An appointment with Dr. Goodman was made for the following week.  (Tr. 585).

Plaintiff saw Dr. Esterberg, an orthopedic resident, on August 21, 2006.  (Tr. 522).   Dr. Esterberg discussed with plaintiff that she may or may not benefit from surgery, and offered for her to try an epidural injection, which plaintiff said she would like to try.  (Tr. 523).  Dr. Esterberg also recommended that plaintiff find a pain clinic. (Tr. 523).

On September 21, 2006, plaintiff was seen by Dr. Christopher Goodman.  (Tr. 568).  Plaintiff complained of increasing back pain and wondering whether she could get a refill of methadone at a higher dose.  (Tr. 568).  Her pain level was 5/10.  (Tr. 568).  Dr. Goodman increased the methadone and the Gabapentin, and continued the Citalopram and Cyclobenzaprine.  (Tr. 570).

Dr. Linares saw plaintiff on September 29, 2006 for a follow-up.  (Tr. 519).  Plaintiff had seen an orthopedics consult in Minneapolis, who assessed plaintiff as having significant degenerative joint disease throughout her lumbar spine but felt that specific treatment of spinal stenosis would not diminish her pain significantly; they recommended an epidural injection and scheduled plaintiff for November 22, 2006.  (Tr. 519).  Plaintiff reported continued significant pain which she rated a 5; that she had to stop to rest while walking two blocks because of severe pain; that she rode a bike occasionally, but had an increase in her pain level afterward.  (Tr. 519).  Dr. Linares noted that plaintiff was walking with an erect posture, and that she did not appear to be

in acute distress.  (Tr. 519).  He increased her methadone and added Etodolac, an anti-inflammatory.  (Tr. 520).

On October 25, 2006, plaintiff called nurse triage at the St. Cloud VA reporting that she had fallen and hurt her left side, as well as pain on the left side of her head.  (Tr. 565).  She was urged to go to urgent care.  (Tr. 565).

On December 28, 2006, plaintiff was seen by Dr. Linares for a follow-up.  (Tr. 516).  Plaintiff complained of increased headaches.  (Tr. 516).  Plaintiff refused to give a pain scale.  (Tr. 516).  Her neck was supple, the motor examination revealed 5/5 strength in all four extremities, and she oriented to person, place and time.  (Tr. 516).  Dr. Linares increased her methadone and ordered a brain MRI.  (Tr. 518).  He discontinued plaintiff's Celexa and placed her on Remeron.  (Tr. 518).

On January 9, 2007, plaintiff saw Jeffrey Wollak, physical therapist.  (Tr. 559).  Plaintiff was given a TENS unit and a rollator for use with ambulating longer distances.  (Tr. 560).  Plaintiff stated that she would like to increase her activity level but was unable to do so due to increased pain.  (Tr. 560).

Plaintiff saw Dr. Fernandez on January 23, 2007.  (Tr. 558).  Plaintiff complained of gaining weight and no improvement in her back.  (Tr. 559).  Since the last time Dr. Fernandez saw plaintiff, plaintiff was having a hard time walking or doing exercise.  (Tr. 559).

Plaintiff saw Dr. Linares on March 28, 2007 for a follow-up.  (Tr. 554).  Plaintiff reported that the epidural injection did not provide any significant relief, but that she would follow up with orthopedics to discuss other options such as surgery for spinal stenosis.  (Tr. 554).  Plaintiff also complained of worsening right shoulder pain.  (Tr.

554).  Plaintiff's pain scale was 7; examination of her right shoulder revealed positive impingement sign; plaintiff had significant pain with attempt at anterior flexion of the arm, with fairly significant reduction in range of motion of the shoulder.  (Tr. 554).  Dr. Linares discontinued plaintiff's Tramadol and placed her on Vicodin.  (Tr. 555).

On March 28, 2007, plaintiff had MRIs of her shoulder and cervical spine.  (Tr. 544).  The shoulder MRI results indicated mild degenerative joint changes, and was otherwise negative.  (Tr. 544).  The spine MRI results indicated progression in degenerative spondylosis of the cervical spine.  (Tr. 545).

42 U.S.C. § 405(g) provides in relevant part:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding, . . . .

See Sullins v. Shalala, 25 F.3d 601, 605 n. 6 (8th Cir. 1994) ("Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), grants reviewing courts the authority to order the Secretary to consider additional evidence, but 'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'").  Further, the regulations, 20 C.F.R. § 404.970(b), provide that the Appeals Council must consider evidence submitted with a request for review if it is "'(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'"  Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000) (citing Box v. Shalala, 52 F.3d 168, 171 (8th Cir.1995) (quoting Williams v. Sullivan, 905 F.2d 214, 216-17 (8th Cir.1990)); Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007).  "To be 'new,' evidence must be more

than merely cumulative of other evidence in the record.  To be 'material,' the evidence must be relevant to claimant's condition for the time period for which benefits were denied."  Bergmann, 207 F.3d at 1069 (citations omitted).  In addition, "to qualify as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition."  Id. at 1069-1070.  Assuming the new evidence meets these criteria, the court's role is then to determine whether the ALJ's decision is supported by the record as a whole, including the evidence submitted to the Appeals Council after the determination was made.  See Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  Thus, the court considers how the ALJ would have weighed the new evidence had it existed at the hearing.  See Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

The Court finds that the additional records that were generated during the period at issue – May 28, 2004 through June 30, 2006 – are not new, but rather are merely cumulative of other evidence in the record.  Further, plaintiff has not provided this Court with any facts to suggest that there is good cause for failing to incorporate such evidence into the record prior to the hearing or decision by the ALJ, particularly when all of these records came from the VA where plaintiff had been treating throughout the relevant time period. As to the balance of the records which were generated after June 30, 2006, the Court concludes that they are not material because they are cumulative of the record that was before the ALJ.

Nevertheless, even if the ALJ had considered all of this additional information, the Court finds that his opinion would have remained the same.  Here, these additional records further belie plaintiff's credibility, and support the ALJ's decision to give reduced

weight to Dr. Linares's opinion regarding plaintiff's restrictions because it was not supported by the medical record.

For example, the additional records support the ALJ's determination that plaintiff's activities of daily living undermine her credibility.  On May 16, 2005, plaintiff saw Betty Barrett, Clinical Nurse Specialist, at the VA in St. Cloud for a mental health evaluation.  (Tr. 532).  Plaintiff stated that she cleaned compulsively.  (Tr. 533).  Plaintiff stated to Dr. Sohler on June 29, 2005, that her main hobbies were cooking, biking and walking, and that she was constantly cleaning.  (Tr. 529-530).  Additionally, on June 16, 2006, Dr. Linares stated that plaintiff seemed to have a fairly well preserved activity level and seemed to function fairly well, and that plaintiff told him that sometimes she rides a bike.  (Tr. 521).  On September 29, 2006, plaintiff reported to Dr. Linares that she was still walking and biking, and that despite complaining of continued severe pain, Dr. Linares also noted that plaintiff was walking with an erect posture, and she did not appear to be in acute distress.  (Tr. 519).  On January 9, 2007, plaintiff told Wollak, the physical therapist, that she would like to increase her activity level but was unable to do so due to increased pain.  (Tr. 560).

Furthermore, the additional records support the ALJ's decision to give reduced weight to Dr. Linares's July 2005 opinion regarding plaintiff's restrictions because it was not supported by the medical record.  On May 22, 2006, Dr. Fey noted that plaintiff moved throughout the room with no clear difficulty, and that she had normal physiologic and symmetric reflexes of bilateral lower extremities.  (Tr. 524).  On June 16, 2006, plaintiff reported a pain scale of 9 of 10 to Dr. Linares, though Dr. Linares noted that she did not appear to be in any significant degree of distress.  (Tr. 521).  On December 28,

2006, Dr. Linares examined plaintiff and found her neck supple, and motor examination revealed 5/5 strength in all four extremities. (Tr. 516). These records are not inconsistent with the ALJ's determination of plaintiff's credibility or his decision to discount the opinion of Dr. Linares from July of 2005.

For all of these reasons, this Court finds that the records submitted to the Appeals Council would not have changed the ALJ's decision that plaintiff is not disabled from engaging in gainful employment, and that the ALJ's decision is supported by the record as a whole, including this additional evidence.

## VI.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ did not err in his decision to deny plaintiff's application for SSI benefits. The ALJ properly discounted treating physician Dr. Linares's opinion of plaintiff's functional limitations because his opinion was inconsistent with substantial evidence in the record as a whole. The ALJ also properly evaluated plaintiff's subjective complaints of pain in light of the medical record and her fibromyalgia. Finally, even if it had been considered, the evidence submitted to the Appeals Council after the hearing before the ALJ would not have changed the ALJ's decision. For these reasons, the Court recommends that plaintiff's motion for summary judgment be denied and the Commissioner's motion for summary judgment be granted.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 9] be denied; and

2.      Defendant's Motion for Summary Judgment [Docket No. 11] be granted.

Dated:        August 19, 2008

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before September 5, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.